811 So.2d 402 (2001)
Nigel BOONE a/k/a Nigel Eugene Boone a/k/a "Eugene Outlaw", Appellant,
v.
STATE of Mississippi, Appellee.
No. 1999-KA-01851-COA.
Court of Appeals of Mississippi.
February 27, 2001.
*403 Thomas L. Kesler, Columbus, Attorney for Appellant.
Office of the Attorney General by Scott Stuart, Attorney for Appellee.
Before McMILLIN, C.J., BRIDGES, and MYERS, JJ.
MYERS, J., for the Court:
¶ 1. Nigel Eugene Boone was indicted by grand jury under Miss.Code Ann. § 97-3-95 (Rev.2000) for sexual battery. Nine days later after confirming two prior felony sexual assault convictions, his indictment was amended to charge Boone as a habitual offender under Miss.Code Ann. § 99-19-81(Rev.2000). Boone went to trial in the Circuit Court of Oktibbeha County, with the Honorable John M. Montgomery presiding. A jury of Boone's peers found him guilty of the sexual assault of M.C.S. Another hearing was held where *404 Boone was adjudicated a habitual offender and sentenced to forty years imprisonment in the custody of the Mississippi Department of Corrections. Feeling that his conviction and sentence are unjust, Boone appeals. Boone focuses on two issues for his appeal. He is challenging whether the trial court erred in allowing Deputy Carrithers to give opinion testimony concerning the search of a computer and whether the verdict in this case was supported by the evidence. Finding no merit in Boone's assertions, we affirm the judgment of the lower court.

FACTS
¶ 2. Shop owners Day and Pearson met Eugene Outlaw a.k.a. Nigel Eugene Boone while on a buying trip to Cozumel for their Mexican pottery and art store. Boone was in Mexico because he was a fugitive from Texas on sexual assault charges. After befriending the ladies, Boone moved to their hometown of Starkville. Boone met and began a romantic relationship with M.C.S., a Starkville native and a news producer at a local T.V. station. M.C.S. allowed Boone the use of a cell phone and allowed frequent visits to her home during the course of the relationship. Their relationship broke down when M.C.S. suspected Boone of using her computer to download pornography and to solicit sex.
¶ 3. Boone stayed in town with the intent of winning back M.C.S.'s affection. She allowed him continued use of the cell phone, and he cleaned up his appearance. M.C.S. was impressed with his apparent turn around. Boone claimed that M.C.S. was so impressed that she agreed to help him get false references and a false resume together to apply for a job. He also claimed that they traveled to Florida together to get Boone a driver's license.
¶ 4. When M.C.S. went to dinner with a co-worker, Boone became very jealous. He told M.C.S. that he watched her kiss a man in front of her house and she realized that he had been watching her. Boone asked M.C.S. to meet on Valentine's Day to patch things up. That meeting did not take place. Another planned meeting did not take place on February 15, 1998. On February 16, 1998, M.C.S. went to Boone's home. When she tried to leave he hugged her and then forced her down on the couch. Boone forced her to engage in sexual acts with him and to pose for sexually explicit photographs. Among other degrading acts, he ejaculated in her hair and face leaving residue in her hair. There were several objects used in the attack which were later found under Boone's trailer in a plastic bag. Boone told M.C.S. that if she reported this incident, he would send the pictures to everyone she knew, including her family and her boss.
¶ 5. M.C.S. went home, told her housekeeper what had happened and took a shower. The housekeeper took M.C.S.'s clothes and washed them. She testified that there was a dried flaky white substance on M.C.S.'s face and hair when she arrived home. M.C.S. told her boss the next day, and he called the sheriff. M.C.S. submitted to a rape kit, photographs and wrote down a statement. Boone was subsequently arrested.
¶ 6. Boone claimed the sex was consensual and that M.C.S. brought over several of the items used. He told the deputies who he really was and that he was fugitive from Texas. He also claimed that M.C.S. knew he was a fugitive from Texas and was helping him establish a new identity. He claimed that the documents proving that she knew could be found on her computer and in her possession. M.C.S. handed over an envelope containing documents she claimed Boone asked her to keep. No other information was found at her residence. *405 Deputy Carrithers, over the objection of Boone, testified at trial that he did a search of the "C" drive on M.C.S.'s computer and found nothing regarding Boone or in corroboration of his story. Carrithers never checked any of the "A" drive disks.
¶ 7. A plastic bag with the items listed in M.C.S.'s report was found under Boone's trailer behind the underskirting. No one attempted to lift fingerprints. The rape kit was retrieved by Deputy Carrithers and placed in a refrigerator. The rape kit deteriorated beyond use. He said he did not send the kit to the crime lab because Boone claimed he and M.C.S. had consensual sex. Deputy Clark testified that they did not send the other items to the crime lab because he and the other investigators felt it would serve no purpose.
¶ 8. Susan McKay testified for Boone that she owned a novelty shop located near M.C.S.'s work place. During the Valentine season the type of novelty item found in one of the plastic bags was sold in her store. That item was in stock on Valentines day.

DISCUSSION

1. WHETHER THE TRIAL JUDGE ERRED WHEN HE ADMITTED OPINION EVIDENCE.
¶ 9. Boone is working under the misguided impression that M.R.E 702, Testimony by Experts, applies here. He is concerned that Deputy Carrithers offered testimony regarding computers about which only an expert would be qualified to testify. Ten years ago that may have been the case. However, in today's technological world, computers are commonplace work and household equipment. Even the most basic user knows which drive holds the memory of the computer versus one of the other drives in operation within the computer. The conflict is whether Carrithers actually offered an opinion. He testified that the hard drive on a computer is where most files are stored and that he found no resume when he searched M.C.S.'s hard drive. This is hardly difficult information to comprehend and does not require additional focused training in computer use to obtain this knowledge.
¶ 10. M.R.E 702 focuses on "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue...." We are not dealing with scientific, technical or specialized knowledge. Deputy Carrithers was not testifying about the upgrade of the computer or the programming used in the development of the computer and software. His testimony concerned the location on the computer where one would look to find saved information. This common usage is an appropriate topic about which a lay person could testify.
If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to the clear understanding of this testimony or the determination of a fact in issue.
M.R.E. 701
¶ 11. The fact that Carrithers used the word "examined" in his testimony when referring to his review of the computer hard drive does not make his testimony expert in nature. "Rule 701 ... provides flexibility when a witness has difficulty in expressing himself in language which does not reflect an opinion. Rule 701 is based on the recognition that there is often too thin a line between fact and opinion to determine which is which." Id., cmt.
¶ 12. Deputy Carrithers's testimony rests comfortably under the umbrella *406 created by M.R.E. 701 as it met both of the elements in M.R.E. 701. He testified that he was "fairly" computer literate and upon examination of the hard drive, he found no resume. His first-hand observation of the computer in question and the fact that he found no file containing Boone's fake resume helped resolve the issue. M.R.E. 701 is the correct evidence rule to apply in this situation. It is within the court's discretion to determine the admissibility of evidence. Crawford v. State, 754 So.2d 1211, 1215 (Miss.2000), Wade v. State, 583 So.2d 965, 967 (Miss.1991). This Court will not overturn the trial court's rulings unless the judge abused his discretion. Edwards v. State, 737 So.2d 275, 302 (Miss.1999). The trial judge committed no error in allowing Deputy Carrithers to testify in this capacity.

2. WHETHER THERE IS SUFFICIENT EVIDENCE TO SUPPORT THE JURY VERDICT.
¶ 13. To determine whether a jury verdict is against the overwhelming weight of the evidence, this Court must accept the evidence as true and reverse if the trial court abused its discretion by not granting a new trial. Crawford v. State, 754 So.2d 1211, 1222 (Miss.2000); Collier v. State, 711 So.2d 458, 461 (Miss.1998). "A new trial will not be ordered unless the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction `unconscionable injustice.'" Crawford, 754 So.2d at 1222; Groseclose v. State, 440 So.2d 297, 300 (Miss.1983).
¶ 14. Boone has trouble understanding how the jury arrived at a guilty verdict. The jury heard conflicting evidence from either side. Questions of fact are the questions to be resolved by a jury. "A trial court should submit an issue to the jury only if the evidence creates a question of fact concerning which reasonable jurors could disagree." Vines v. Windham, 606 So.2d 128, 131 (Miss.1992). They were told that M.C.S. was pinned down, dragged from one room to another, forced to engage in sexual acts with Boone and forced to pose in sexually suggestive pictures. The jury also heard evidence that Boone threatened to show those pictures to M.C.S.'s employer, co-workers and family if she told others of the incident in question. The jury heard the housekeeper/babysitter testify that she saw some flakey white substance in M.C.S.'s hair and eyebrows and that M.C.S. was shaky when she arrived home. The photographs taken by the authorities at the hospital showed the bruising left on M.C.S. after her encounter with Boone. The jury also heard of the elementary mistakes made by the Oktibbeha County Sheriff's Department by not properly storing the rape kit, thus rendering it useless for DNA tests. The jury was faced with many facts through which they had to sift.
¶ 15. This case pits the testimony of Boone and M.C.S. against one another. Boone says she consented to the sexual encounter. M.C.S. said she did not. Boone tried to use the prior relationship with M.C.S. to infer that she consented to the sexual encounter. The sexual encounter is the problem here, not whether M.C.S. supported Boone and whether she tried to help him obtain a new identity. The jury weighed all of the evidence and testimony and found Boone guilty.
¶ 16. Boone offers no real support for his contentions that the trial court erred. Therefore, this Court affirms the conviction of Nigel Boone.
¶ 17. THE JUDGMENT OF THE CIRCUIT COURT OF OKTIBBEHA COUNTY OF CONVICTION OF SEXUAL BATTERY AND SENTENCE OF FORTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF *407 CORRECTIONS AS AN HABITUAL OFFENDER IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO OKTIBBEHA COUNTY.
McMILLIN, C.J., KING and SOUTHWICK, P.JJ., PAYNE, BRIDGES, THOMAS, LEE, IRVING and CHANDLER, JJ., concur.